2026 IL App (1st) 250987-U

No. 1-25-0987

Order filed August 4, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 1920 |
| | ) | |
| LUIS AGUILAR, | ) | Honorable |
| | ) | Nicholas Kantas, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The evidence at trial was sufficient to prove defendant guilty of attempted first degree murder beyond a reasonable doubt.

¶ 2     Following a bench trial, defendant Luis Aguilar was found guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2022)), aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2022)), and aggravated battery with a deadly weapon (720 ILCS 5/12-3.05(f)(1) (West 2022)). The trial court merged the counts and imposed 14 years in prison for attempted first

degree murder. On appeal, defendant contends that his attempted first degree murder conviction should be reduced to aggravated domestic battery because the State failed to prove beyond a reasonable doubt that he acted with the specific intent to kill. For the reasons that follow, we affirm.

¶ 3    Defendant's conviction arose from events on November 28, 2022. Following arrest, defendant was charged by indictment with one count each of attempted first degree murder, aggravated domestic battery, and aggravated battery with a deadly weapon against his girlfriend, Emilia E. (Emilia).

¶ 4    Prior to trial, the State filed a motion seeking to admit other-crimes evidence involving prior encounters between defendant and Emilia. Over defendant's objection, the court allowed the admission of incidents that occurred on September 27, 2021, and March 11, 2022.

¶ 5    At trial, Emilia testified that she had been in an "on and off" relationship with defendant since 2020. On November 28, 2022, they had been separated for six months. Around 8 p.m. that evening, Emilia went to defendant's house because he was angry and she wanted to stop him from blackmailing her with explicit photos of her that he was trying to sell on social media and that he had threatened to send to her parents.

¶ 6    Defendant accused Emilia of "messing with other people," and Emilia told him to calm down. They watched television, smoked marijuana, and argued. Defendant also drank alcohol and ingested cocaine. They had sex in the living room, after which Emilia fell asleep on the couch.

¶ 7    Emilia awoke to a sharp pain on the back of her left thigh. She got up and saw that defendant was holding a sledgehammer. He called her a "b***" and asked where her phone was. Emilia "tried to fight him off" by pulling his hair. Defendant dropped the sledgehammer and "body slammed" Emilia to the floor. When Emilia got up, defendant retrieved a knife from a nearby

recliner and "[s]tabbed [her] directly in the eye." In response to questions posed by the court, Emilia specified that the knife was approximately "a centimeter off of puncturing my eye socket."

¶ 8    With blood "pouring out" of her wound, Emilia struggled with defendant. They punched each other and moved from the living room to the foyer. According to Emilia, defendant "had been *** still threatening me, telling me that he was going to kill me" and stabbed her right arm twice. Emilia begged for her life, implored defendant to stop, and told him she had to work the next day and could not afford to call off. Defendant said he did not "give a f***." He then stabbed the upper left side of her back. As he "just continued on saying I don't give a f***, like I don't care, I want you to die," he stabbed Emilia in the lower back next to her spine.

¶ 9    Emilia ran behind a closet door, using it like a shield, with half her body inside the closet. Emilia did not close the closet door all the way because she was claustrophobic. She pleaded with defendant to stop stabbing her. He told her that he would "make sure that [she] took [her] last breath" and repeatedly referred to himself as Pablo Escobar. Emilia ran from the closet into the adjacent bathroom. She closed the bathroom door behind her and, because there was no lock, braced her foot on the sink and her body against the door to keep it shut. As defendant and Emilia pushed at the door from opposite sides, it jammed. While defendant tried to force the bathroom door open, he called Emilia a whore and said, "I hope you die," "I'm going to get you, b***," "you're not going to make it," and "you're going to f*** die."

¶ 10   Emilia looked in the mirror, saw the severity of her stab wounds, and screamed from the bathroom window for help. When no one appeared, she scrambled onto the sink and started climbing through the window. Halfway out, she heard the home alarm system alert "front door

open." She then saw defendant running toward her from outside the residence, so she retreated into the bathroom.

¶ 11     When defendant again attempted to force the bathroom door open, Emilia "played dead." She explained that she was scared and wanted defendant to think she had died so that he would call an ambulance or "freak out." Defendant started crying. Emilia heard him say "she's dying," and "I've got to do something about it." Defendant then called his father, told him Emilia was dying and needed to go to the hospital, and asked him to come to the house as soon as possible. Emilia then told defendant to open the door because she would die and needed to go to the hospital. Defendant did not attempt to open the door.

¶ 12     Shortly thereafter, Emilia heard defendant's father's voice. Defendant's father hit the door with the sledgehammer repeatedly. While he was doing so, Emilia heard defendant going through her purse and dumping its contents onto the floor. Once the door broke open, Emilia asked defendant's father where defendant was. Defendant's father answered that defendant had left the house. Emilia noticed that her wallet and phone were missing. She asked defendant's father to call 911, and he answered that the police were already on their way.

¶ 13     The State introduced video from responding officers' body-worn cameras. The footage, which is included in the record on appeal and this court has reviewed, depicts Emilia showing officers her injuries and officers walking through the living room, foyer, and bathroom.

¶ 14     Emilia testified that when she spoke with the officers at the scene, she told them she did not know who injured her. In court, she explained that she lied to the police because she was scared of defendant.

¶ 15    Emilia was transported by ambulance to the hospital, where she told an officer that defendant injured her. Emilia explained that she realized that defendant would "finally *** see justice" after "all the attacks that he's ever done on me." The officer photographed Emilia's injuries. The photos, which were entered into evidence and are included in the record on appeal, depict a stitched wound running from the inner corner of her right eyebrow to the bridge of her nose; stab wounds to her arm and back; a stitched wound on the back of her thigh; a scratch on her leg; and bruises on her legs, feet, and arm. Emilia later underwent reconstructive surgery on her nose due to the incident.

¶ 16    Emilia testified about two other incidents with defendant. The first occurred at his house on September 27, 2021. Defendant accused Emilia of cheating on him, called her a whore, and complained that she did not want to have sex with him. He punched her repeatedly in the face and body. Emilia begged him to stop and ran outside. Defendant chased her and threw a brick at her.

¶ 17    The second incident occurred at defendant's house on March 11, 2022. That morning, defendant woke Emilia, called her a whore and a b***, and accused her of not wanting to have sex with him. Emilia told defendant "to shut the f*** up," calm down, and get ready for work. Defendant then hit her face with a wine bottle 7 to 10 times. He stopped when he realized a "gash" below her left eyebrow was bleeding. Emilia ran outside and called a friend. She received stitches that day and had surgery about a week later.

¶ 18    Chicago police evidence technician James Obaldo testified that he photographed suspected blood stains on the home's floors, walls, and staircase. He also photographed a knife and a sledgehammer found in the living room. The photos, which were admitted into evidence and which this court has viewed, depict, among other things, a knife next to a ruler, showing the blade to be

eight inches long, and a sledgehammer with a metal head, blunt on one end and wedged on the other.

¶ 19    The defense called Dr. Thomas Messer, who testified that he supervised Emilia's treatment in the hospital's trauma department. Emilia presented with six stab wounds and an orbital wall fracture, but no major internal injuries. Regarding the orbital wall fracture, Messer explained, "the orbit is the bony cavity that the eye is in, in the skull and it was a fracture of the wall of that cavity." The stab wounds on Emilia's face and thigh required stitches.

¶ 20    Chicago Fire Department paramedic Jeff Devoss testified, after refreshing his recollection with a report he wrote, that he treated Emilia at the scene. According to his report, Emilia had multiple stab wounds that were not actively bleeding. When Devoss asked Emilia what happened, she refused to provide any information other than that she had been stabbed.

¶ 21    Following closing arguments, the trial court found defendant guilty of attempted first degree murder, aggravated domestic battery, and aggravated battery with a deadly weapon.

¶ 22    Defendant filed a motion for a new trial, which the trial court denied. The court subsequently merged the counts into the count of attempted first degree murder and sentenced defendant to 14 years in prison.

¶ 23    On appeal, defendant challenges the sufficiency of the evidence to sustain his conviction for attempted first degree murder. Specifically, he argues that the State failed to prove beyond a reasonable doubt that he acted with the specific intent to kill Emilia and, therefore, his conviction should be reduced to aggravated domestic battery.

¶ 24    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 25 "The offense of attempted murder is shown when the State proves, beyond a reasonable doubt, that the defendant, with the specific intent to kill, commits *any act* which constitutes a substantial step toward the commission of murder." (Emphasis in original.) *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004). A defendant's intent is a question of fact to be determined by the trier of fact. *Id.* Intent can be inferred from surrounding circumstances, such as the character of the attack, the use of a deadly weapon, and the severity of injury. *Id.* (citing *People v. Williams*, 165 Ill. 2d 51, 64 (1995)). Intent can also be inferred "from an act, 'the direct and natural tendency of which is to destroy another's life.' " *Id.* (quoting *People v. Hill*, 276 Ill. App. 3d 683, 688 (1995)).

¶ 26 Defendant argues that the State failed to prove the requisite intent to sustain his conviction. He argues that although he verbally threatened to kill Emilia, used two deadly weapons, and had a clear opportunity to murder her both while she slept on the couch and while she was half-hidden behind a closet door, he did not do so. He further asserts that he lacked the intent to kill where none of her wounds were life-threatening; she suffered no major internal injuries; and where he

stabbed her thigh, back, arm, and face, rather than a "deadly" location, such as her throat. Finally, defendant maintains that his act of calling his father for help contradicts an intent to kill.

¶ 27    After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could infer that defendant had the specific intent to kill Emilia based on his conduct throughout the attack. Emilia testified that defendant woke her by striking her thigh with a sledgehammer. He then stabbed her face with an eight-inch blade, approximately "a centimeter off of puncturing [her] eye socket," with enough force to fracture the orbital wall. In the ensuing struggle, he stabbed her right arm twice, her upper back, and her lower back next to her spine.

¶ 28    Evidence that a defendant voluntarily and willfully committed an act, the natural tendency of which is to cause death or great bodily harm, is sufficient to establish the intent required for the offense of murder. *People v. Bennett*, 329 Ill. App. 3d 502, 513 (2002). Here, defendant's forceful stabbing of Emilia's face and repeated stabbing of other parts of her body proved his intent to kill her. See *People v. Hope*, 142 Ill. App. 3d 171, 172-73, 177 (1986) (stabbing of the victim "a number of times" established the defendant's intent to kill the victim despite the fact that a "concern that one stab wound may have penetrated her abdomen *** proved to be groundless"); *People v. Elsesser*, 2024 IL App (4th) 230092-U, ¶¶ 13, 51-53 (intent to cause death could be inferred where the defendant stabbed the victim in the inner thigh, abdomen, and arm with a five-inch blade and stated that she would kill him); Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 29    The fact that defendant stopped stabbing Emilia after she shielded herself with the closet door is not dispositive, as once the elements of attempted murder are complete, abandonment of the criminal purpose is no defense. See *People v. Myers*, 85 Ill. 2d 281, 290 (1981); see also *People*

*v. Parker*, 311 Ill. App. 3d 80, 90 (1999) (abandonment is not a defense to criminal attempt). Further, while a defendant's conduct after an attempted murder is one of the surrounding circumstances a fact finder may consider when determining whether the defendant intended to kill when he took the substantial step toward the commission of murder (see *Parker*, 311 Ill. App. 3d at 90), defendant's act of calling his father for help after Emilia decided to "play dead" does not automatically negate defendant's intent while stabbing her. Here, after defendant stabbed Emilia multiple times and she became trapped in the bathroom, he called his father rather than 911. By the time defendant's father broke the bathroom door open, defendant had fled the scene, apparently with Emilia's phone and wallet. We cannot find that these actions negate the evidence of defendant's intent to kill Emilia when he stabbed her.

¶ 30    Moreover, while intent is usually inferred from circumstantial evidence, here, the State also presented direct evidence of defendant's mental state because he made multiple verbal threats to Emilia, stating his intent to kill her. *People v. Schlott*, 2019 IL App (3d) 160281, ¶ 42. Emilia testified that, after defendant stabbed her face, he was "still" threatening to kill her. As he continued stabbing other parts of her body, he told her he wanted her to die, and when she shielded her body with the closet door, he said he would ensure she took her "last breath." The threats continued after Emilia barricaded herself in the bathroom, when defendant said he would "get" her, that she was "not going to make it," and that she was "going to f*** die." Viewed in context, defendant's threats evidenced his intent to kill Emilia. See *id.* ¶¶ 14, 42 (the defendant's threat to cut the victim's head off while he was cutting her repeatedly, including on the neck, was "*extremely probative* of his intent to kill her" (emphasis in original)); see also *People v. Sotomayor-Quan*, 2021 IL App (1st) 181617-U, ¶ 40 (the defendant's statements to the victim that he would kill her,

she deserved to die, she would die that day, and she would die in silence were direct evidence of the defendant's intent to kill and were sufficient to sustain his conviction to attempted first degree murder).

¶ 31    We are mindful of defendant's argument that this court's decision in *People v. Reynolds*, 2021 IL App (1st) 181227, is instructive. In *Reynolds*, the defendant choked the victim several times, repeatedly hit her face with the blunt end of a box cutter, held the box cutter to her neck, and dug it into her skin, cutting her. *Id.* ¶¶ 7-9. When the victim attempted to escape from the defendant's truck, he grabbed her, dragged her down an alley, and eventually ran over her leg. *Id.* ¶ 12. Throughout the encounter, the defendant accused the victim of cheating on him and threatened to kill her numerous times. *Id.* ¶¶ 7-12. On appeal, this court acknowledged that the defendant violently assaulted the victim and that he threatened to kill her, but found the character of the attack was more consistent with an intent to torture or terrorize the victim into confessing that she cheated on him. *Id.* ¶ 41. We explained that while the defendant possessed a deadly weapon, he did not use it in a deadly fashion, such as by slashing the victim's throat; rather, he produced only "superficial" cuts with the box cutter, and he always stopped choking the victim after short periods of time. *Id.* We further reasoned that although the victim's injuries were extensive, they were not life-threatening. *Id.*

¶ 32    We find the instant case distinguishable. Here, in contrast to *Reynolds*, defendant used a deadly weapon in a deadly fashion. Specifically, he used an eight-inch blade to attempt to stab Emilia in the eye, barely missing his target and using enough force to fracture her orbital wall. That defendant missed is not a defense to attempted murder. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 75. In addition, unlike in *Reynolds*, we cannot characterize Emilia's injuries

as "superficial" where her orbital wall was fractured and eventually required reconstructive surgery. Finally, while we found in *Reynolds* that the defendant's actions and verbal threats were more consistent with an attempt to terrorize the victim into confessing to having cheated on him than with an intent to kill, no such alternative intent is suggested by the facts presented here. This court is not required to reverse a conviction just because another court did so in a case involving some, but not all, of the same facts. *Sotomayor-Quan*, 2021 IL App (1st) 181617-U, ¶ 42.

¶ 33 After reviewing the evidence in the light most favorable to the prosecution, as we must, we find that a rational trier of fact could have found defendant guilty of attempted first degree murder beyond a reasonable doubt. In sum, the evidence is not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Accordingly, defendant's challenge to the sufficiency of the evidence fails.

¶ 34 For the reasons explained above, we affirm the judgment of the circuit court.

¶ 35 Affirmed.